IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Carol Walunga,                          )
                                        )
        Plaintiff,                      )
                                        )
                                        )
    v.                                  ) Case 13 CV 0759
                                        )
                                        )
Carolyn Colvin, Acting Commissioner     )
of Social Security,                     )
                                        )
        Defendant.                      )


MEMORANDUM OPINION AND ORDER

Plaintiff Carol Walunga ("Walunga") brought this action
against Carolyn W. Colvin, Acting Commissioner of the Social
Security Administration (the "Commissioner"), seeking review of
the denial of her application for disability insurance benefits.
She filed a motion for summary judgment, claiming that the
Commissioner's final decision that Walunga was not disabled and
thus not entitled to Supplemental Security Income Benefits
("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§
405(g), 416 (i), 423(d) (2009), was not supported by substantial
evidence.  For the reasons that follow, Walunga's motion is
granted in part and denied in part, and this case is remanded to
the Social Security Administration for proceedings consistent
with this opinion.

1

**Procedural History**

In May 2006, Walunga filed her initial application for SSI, claiming that she had been disabled since January 1, 1999, as a result of various ailments, including hearing loss in both ears; severe asthma; back, hip and knee pain; and congestive heart failure.  Her claim was denied on September 7, 2006, and upon reconsideration on December 12, 2006.  Walunga then requested a hearing, which took place on April 23, 2008, before an administrative law judge ("ALJ"), who denied the claim on November 20, 2008.  Walunga requested that the Appeals Council review the ALJ's final decision, and on August 12, 2010, the Appeals Council remanded Walunga's claim back to an ALJ. Subsequently, Walunga appeared at a second hearing, along with a vocational expert ("VE").  An ALJ again denied all of Walunga's claims. She again requested that the Appeals Council review the ALJ's decision denying her benefits, but that request was denied. When the Appeals Council denied Walunga's request for review, the Commissioner's decision became final, *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Walunga filed a claim in this Court.

**ALJ Ruling**

In his reaching his decision, the ALJ employed the five-step evaluation process for determining whether a claimant is

disabled. That process requires a determination of (1) whether the claimant is presently employed; (2) whether the claimants's impairments or combination of impairments is severe; (3) whether the claimant's impairments meet or medically equal a listed impairment that the Social Security Administration has found to be disabling; (4) whether the claimant has the residual functional capacity to perform her past work; and (5) whether the claimant is unable to perform any other work in the national economy. 20 C.F.R. 404.1520; *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The steps are sequential; an affirmative answer at step three or step five results in a finding that the claimant is disabled. *Craft v. Astrue*, 539 F.3d 668, 673-74 (7th Cir. 2008). The claimant has the burden of proof on steps one through four; the Commissioner assumes the burden of proof at step five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ found that Walunga had severe impairments, including obesity, congestive heart failure with history of mild concentric left ventricular hypertrophy, osteoarthritis bilateral knees, perforated right eardrum with profound hearing loss, chronic obstructive pulmonary disease ("COPD"), asthma with shortness of breath, degenerative changes of the lumbar spine, and degenerative changes in the left shoulder glenohumeral joints. He did not, however, find that she suffered from "an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments in 20 C.F.R. Part 404,
Subpart B, Appendix 1 (20 C.F.R. 416.920(d) and 416.926).
Specifically, he declined to find at Step Three that Walunga was
disabled by her asthma under Listing 3.03 B or chronic heart
failure under Listing 4.02.

**Asthma**, **Listing 3.03B**

The Listing for asthma "specifically includes a requirement
for continuing signs and symptoms despite a regimen of prescribed
treatment." 20 C.F.R. Pt. 404, Subpt. P, App 1, 3.00. It goes on
to define asthma attacks as

> prolonged symptomatic episodes lasting one or more
> days and requiring intensive treatment, such as
> intravenous bronchiodilator or antibiotic
> administration or prolonged inhalational
> bronchiodilator therapy in a hospital, emergency room
> or equivalent setting. Hospital admissions are
> defined as inpatient hospitalizations for longer than
> 24 hours. The medical evidence must also include
> information documenting adherence to a prescribed
> regimen of treatment as well as a description of
> physical signs. For asthma, the medical evidence
> should include spirometric results obtained between
> attacks that document the presence of baseline
> airflow obstruction.

20 C.F.R. Pt. 404, Subpt. P, App 1, 3.00C. Listing 3.03B also
states that a claimant is impaired when asthma attacks

> in spite of prescribed treatment and requiring
> physician intervention, occur[] at least once every 2
> months or at least six times per year. Each in-
> patient hospitalization for longer than 24 hours for
> control of asthma counts as two attacks, and an
> evaluation period of at least 12 consecutive months
> must be used to determine frequency of attacks.

4

Listing 3.03 Asthma, 20 C.F.R. Pt. 404, Subpt. P, App 1, 3.03B.

In reviewing Walunga's medical history, the ALJ found that although she had listed numerous visits to the hospital, those visits did not total the requisite six visits *for asthma attacks* within a year. Relevant to this appeal, the ALJ evaluated Walunga's hospital visits from December 27, 2010, February 8, 2011, May 6, 2011, and May 14, 2011, and found that not all of them qualified as hospitalizations for an asthma attack under the Listing.

For example, the ALJ reviewed Walunga's hospital records from December 27, 2010, when she was admitted for chest pain and pneumonia, and noted that the "[p]hysical examination revealed that the claimant was not in acute respiratory distress, and her lungs were clear." *Id.* at 5. He also noted that Walunga's "[c]ounsel admits this visit was not for asthma," which, along with the fact that the treating physician's notes indicate that Walunga suffered only "mild respiratory distress," with no evidence of acute asthma symptoms, led the ALJ to conclude that this visit did not count as a hospitalization for asthma as contemplated by Listing 3.03B.

Of Walunga's February 8, 2011 admission to the hospital for shortness of breath, the ALJ noted that the hospital records indicated that "her provisional diagnosis included chest pain and psoriasis." *Id.* Because Walunga's "shortness of breath was noted

to be possibly related to her eczema," the examination of her "lungs were clear," she was "diuresed with Lasix" to treat her heart condition, and was given medication for psoriasis, the ALJ did not find it was a hospitalization for an asthma attack as defined by the Listing.

The ALJ also evaluated Walunga's May 6, 2011 visit to the hospital where she reported a variety of ailments, including shortness of breath, burning skin, and black stools. *Id.* At the hospital, she "was given the differential diagnosis of astam[*sic*], CHF exacerbation, COPD, pulmonary edema, and reactive airway disease." *Id.* at 5. However, the ALJ noted that in the admissions record, Walunga stated that she suffered from shortness of breath "sometimes," but denied experiencing it at the time of admission, thus leading the ALJ to conclude this was not a hospitalization for an asthma attack under the Listing. *Id.*

The ALJ similarly declined to count Walunga's May 14, 2011, hospitalization as one for asthma, even though she "complained of shortness of breath and was found to have COPD exacerbation." *Id.* at 6. Upon review of the records, he determined that she "did not appear to be in any acute respiratory distress upon physical examination." *Id.* at 6.

In concluding his analysis of Walunga's asthma, the ALJ, with citation to the criteria outlined in Listing 3.03B, explained that the Listing "requires attacks" that lead to

hospitalization "for the control of asthma," and found that in many of Walunga's hospitalizations she has failed to demonstrate the requisite acute respiratory distress and subsequent treatment to meet Listing 3.03B. Because "[h]er hospital visits do not reveal the intensive treatment required by the Listing," and the record indicates that her "[p]ulse oximetry testing has generally been normal," the ALJ found that she did not meet the Listing. *Id.* at 6.

He also reviewed Walunga's additional medical evidence, as required by Listing 3.03B, and noted that she failed to document her adherence to a prescribed regime of treatment, as well as a description of her physical signs. *Id.* at 6. Thus, finding that Walunga failed to meet the requirements of Listing 3.03B, the ALJ ruled that she was not disabled due to asthma attacks.

**Chronic Heart Failure, Listing 4.02**

Listing 4.02 describes chronic heart failure as "heart failure while on a regimen of prescribed treatment, with symptoms and signs," that include

> [m]edically documented evidence ... [of either]
> [s]ystolic failure and [d]iastolic failure [either of
> which results in] (1) [p]ersistent symptoms of heart
> failure which very seriously limit the ability to
> independently initiate, sustain or complete
> activities of daily living in an individual for whom
> ... the performance of an exercise test would present
> a significant risk to the individual; (2) [t]hree or
> more separate episodes of acute congestive heart
> failure within a consecutive 12-month period ... with
> evidence of fluid retention from clinical and imaging

> assessments ... requiring acute extended physician
> intervention such as hospitalization or emergency
> room treatment for 12 hours or more; or (3)
> [i]nability to perform on an exercise tolerance test
> ... due to ... [d]yspnea, fatigue, palpitations, or
> chest discomfort.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.03.  In evaluating

Walunga's heart ailments, the ALJ acknowledged at the outset that

she suffered from breathing and cardiovascular impairments, which

at times were severe enough to require hospitalization.

In reviewing her records, he noted that throughout 2006 and

2007, she complained of shortness of breath, but "at worst, her

symptoms were mild." *Id* at 9.  He further explained that X-rays

of Walunga's chest "showed no evidence of pulmonary emboli," and

there was no evidence of acute process. *Id.*  In January of 2010,

Walunga's chest x-ray indicated "no radiographic evidence of

acute cardiopulmonary disease." *Id.*

The ALJ noted that in May 2010, Walunga consulted a doctor

for shortness of breath and that her treating physician found

only mild left atrial enlargement, though he could not rule out

mild concentric left ventricular hypertrophy. *Id.* at 8-9.   He

also considered that at her follow-up appointment in June, "[t]he

impression was that she was doing fine," and "[a] chest x-ray in

July of 2010 showed no evidence of active disease in the chest."

*Id.* He noted that in September and December 2010, Walunga was

again x-rayed, which revealed only mild symptoms, such as

"basilar volume loss and elevation of the diaphragm" along with edema and "mild respiratory distress." *Id.* The ALJ noted there was no further treatment until May 2011 when she was admitted to the hospital for shortness of breath, which was diagnosed as COPD exacerbation. *Id.* at 10. "At that time it was noted that the claimant had a stable history of congestive heart failure and there was no evidence of cardiac decompensation." *Id.*

Ultimately, the ALJ found that the record evidence failed to demonstrate that Walunga met the criteria for congestive heart failure.

Because Walunga had no past relevant work, the ALJ's final consideration was whether she could make an adjustment to work in Step Five. He found that Walunga had the residual capacity to perform sedentary work that occasionally required her to balance, stoop, kneel, crouch, or crawl. In reaching that decision, he considered all of Walunga's "respiratory and cardiovascular impairments in consideration with the residual functional capacity and limited her to less than sedentary work with limited exposure to pulmonary irritants." *Id.* at 10. The ALJ also evaluated Walunga's testimony, recognizing that "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone." *Id.* at 10; *see* Social Security Ruling 96-7p.

In his analysis of Walunga's testimony, the ALJ found that Walunga "is not always compliant with treatment," including when she stopped taking her blood pressure medication and continued smoking despite medical recommendation to stop. *Id.* He also noted that her records indicated that she had "several 'no call no show' appointments." *Id.* He also reviewed Walunga's work history, noting that "she has never worked at the substantial gainful activity level." *Id.* He noted that her testimony was that she had not worked since 1989 "due to her impairments," but the ALJ found that she did not suffer significant health problems until many years later. *Id.* He found that "[h]er minimal lifetime earnings do not reflect a desire or willingness to work and therefore make it difficult to attribute her unemployment to disability." *Id.*

The ALJ also evaluated the opinion evidence, including the testimony of Dr. Jilhewar, who provided a medical interrogatory, and opined that Walunga was "limited to a so[-]called sedentary capacity." *Id.* at 11. Because Dr. Jilhewar "conducted a thorough review of [Walunga's] file as evidenced in his notes and the record supports this opinion, the ALJ gave it "great weight." *Id.* at 11.

Referring to the "objective findings of record," the ALJ found "some abnormalities" for which he accounted when he assessed her residual functional capacity. *Id.* However, he

determined that "testing has generally showed only mild to moderate pulmonary, cardiac or musculoskeletal abnormalities." *Id.*

To determine what jobs Walunga could perform in light of her limitations, age, education, work experience and residual functional capacity, the ALJ asked a vocational expert ("VE") to offer an opinion. *Id.* at 12. The VE testified "that given all of these factors the individual would be able to perform the requirements of representative occupations such as bench assembler ... and an inspector." *Id.* The ALJ credited that testimony and concluded that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.* at 13.

## II.

According to the Social Security Act, a claimant is disabled if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(3)(A). In reviewing the Commissioner's final decision that Walunga is not disabled, I must determine whether the ALJ "applied the correct legal standards and supported [his] decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013);

42 U.S.C. § 405(g).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bates*, 736 F.3d at 1098 (internal citations omitted). "The ALJ is not required to address every piece of evidence or testimony presented, but must provide 'an accurate and logical bridge' between the evidence and [his] conclusion that a claimant is not disabled." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citations omitted).  Where "a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Id.* (internal citations omitted).  Finally, the Seventh Circuit applies a deferential standard of review to the ALJ's ruling; therefore, I am not empowered to substitute my judgment for that of the ALJ's or re-weigh the evidence. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005).

III.

On appeal, Walunga argues that the ALJ erred in his analysis at Step Three when he found that she did not meet the requirements for chronic asthma under Listing 3.03B, and when he failed to consider whether she met or equaled the Commissioner's listing of impairments for chronic heart failure under 4.02.  She likewise challenges the ALJ's failure to resolve the conflict between the testimony of the VE and the Dictionary of Occupational Titles, as well as his credibility determinations.

12

**Asthma**

Walunga argues that the ALJ erred in his Step Three determination, because she has met the criteria in Listing 3.03B for asthma attacks because her hospitalizations for asthma totaled at least six in the period of one year.  Both Walunga and the Commissioner agree that in order to meet the criteria in this listing, she must prove, *inter alia*, that over a period of twelve months, asthma attacks, as defined by 20 C.F.R. Pt. 404 Subpt. P. App. 1 (listing) § 3.00C, occurred at least once every two months or at least six times every twelve months.  Def. Resp. Br. [#20] at 6-7.  Walunga argues that she has proved the requisite hospitalizations and treatments.  Specifically, she argues that she was hospitalized for asthma on December 27, 2010 (2 visits), February 8, 2011 (1 visit), May 6, 2011 (1 visit), May 14, 2011 (2 visits). Plt. Mem. Supp. S.J. [#12] at 10.  She urges that in each of those visits she underwent breathing treatments and testing, including chest x-rays and CT scans; therefore, she has proved she meets Listing 3.03 B for asthma.  *Id.*

The Commissioner argues that the ALJ determination was correct because not all of the hospitalizations that Walunga cites count as asthma attacks under Listing 3.03B because in order to qualify as an attack, a claimant must receive intensive treatment, such as an intravenous bronchilator, antibiotic administration, or prolonged inhalation bronchodilator therapy.

13

She urges that Walunga has failed to produce sufficient evidence that she received the required intensive treatments during her hospital admissions. The Commissioner also notes that Walunga failed to produce medical records documenting that she adhered to the prescribed treatment or describing her physical signs, including the results of spirometric tests conducted between attacks that document a baseline airflow obstruction.

In his decision, the ALJ correctly cited the requirements of the Listing and proceeded to analyze the records from Walunga's hospital visits, including the admissions reports, Walunga's symptoms upon admission, all of the doctors' notes, and the treatments administered during her stay. For each of her visits, the ALJ noted the description of her breathing and her lungs. I am convinced that he built the requisite logical bridge between the evidence and his decision about whether Walunga's hospital visits were for the control of asthma as contemplated by Listing 3.03B.

In deciding that Walunga's December 27, 2010 visit was not for the control of an asthma attack, that ALJ noted that Walunga only suffered from "mild respiratory distress" and that her "[l]ung fields remained grossly clear of acute process," ultimately finding that the visit was "due to pneumonia, not asthma."

Similarly, he explained why he refused to credit Walunga's February 8th and 9th, 2011 hospitalization as treatment for an asthma attack because while she noted shortness of breath upon admittance, her provisional diagnosis included chest pain and psoriasis. *Id.* He also noted that when Walunga's lungs were examined, they were "clear". *Id.* Moreover, he found that the treatments Walunga received during this visit were for her heart condition and her psoriasis, not asthma. *Id.*

Similarly, in reviewing the records from Walunga's May 6-7, 2011 hospitalization, the ALJ found that while she complained of shortness of breath upon arriving at the emergency room and was diagnosed with asthma, her pulse oximetry testing was "normal." *Id.* He also noted that Walunga reported upon admission that she "gets short of breath 'sometimes' when her asthma acts up but currently denied any shortness of breath." *Id.* The doctors' notes about Walunga's treatment and her statements to the hospital staff led the ALJ to conclude that "while the visit was characterized as an exacerbation of COPD, the claimant denied significant shortness of breath on admission," and thus, this did not count as hospitalization due to an asthma attack.

In each of the hospital visits, the ALJ was looking for a "prolonged symptomatic episode, lasting one or more days and requiring intensive treatment," as required by the Listing. He ultimately found that "[h]er hospital visits do not reveal the

intensive treatment required by the Listing .... [n]or do they contain spirometric results obtained between attacks that document the presence of a baseline airflow obstruction." *Id.* at 6. He also explained that the number of hospitalizations "is only one aspect the claimant must prove to show she meets or equals Listing 3.03B," and noted that Walunga failed to document her adherence to the prescribed treatment, as well as her physical signs, both of which are requirements of the Listing. *Id.* at 5-6.

In his assessment, the ALJ built the requisite "logical bridge from his evidence to his conclusion" by supporting his decision with the evidence contained in the hospital reports. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). For each of the hospitalizations he rejected under the Listing, he gave an detailed and logical explanation, each time finding that the medical documentation failed to prove that Walunga was suffering from a "prolonged symptomatic episode" that required "intensive treatment." Because the evidence supports the ALJ's conclusion, I uphold his decision.

### Chronic Heart Failure

Walunga also argues that the ALJ also erred when he failed to find that she met or equaled Listing 4.02 for chronic heart failure. She urges that the ALJ's analysis of her chronic heart condition was "perfunctory" and that he failed to provide

16

sufficient analysis regarding whether she met that listing. Plt. Mem. Supp. S.J. [#12] at 11. The Commissioner argues that the ALJ was not required to engage in a detailed analysis of this claim because Walunga failed to present sufficient evidence for the ALJ to evaluate whether Walunga met the requirements of Listing 4.02.

An ALJ is required to demonstrate that all the evidence has been considered and analyzed in light of the requirements of the Listing. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786-87 (7th Cir. 2003) (finding that the ALJ's "conclusory and conflated analysis prevents this court from finding that substantial evidence supports the ALJ's conclusions"). The Seventh Circuit has held that "[i]n reviewing Step Three determinations, an ALJ should mention by name the specific listings he is considering; his failure to do so, if combined with a 'perfunctory analysis,' requires remand." *Mogg v. Barnhart*, 199 Fed. Appx. 572, 575 (7th Cir. 2006) (explaining that the ALJ's "path of reasoning" needs to be clear enough to trace).

In his decision, the ALJ mentions that he considered Listing 4.02 for congestive heart failure, and found that she did not meet the criteria for the Listing. ALJ Dec. [#8-3] at 4. What he fails to do is offer any "path of reasoning" at all, such that I can trace the evidence to his conclusion. This perfunctory

17

analysis is insufficient in light of the ample evidence in the record that Walunga suffered from heart ailments that often required hospitalization, which he noted in passing when he analyzed her asthma attacks. *See e.g.,* ALJ Dec. [#8-3] at 4-5 (rejecting the characterization of Walunga's May 20, 2010 hospital admission as one for the treatment of an asthma attack because it was for a "cardiac problem"). Because the ALJ simply mentioned Listing 4.02 without elaborating on the record evidence that led to his conclusion, the case must be remanded for a decision that provides the requisite detail to ensure that his decision was supported by substantial evidence. *See Brindisi,* 315 F.3d at 787 (recognizing "that even a 'sketchy opinion' is sufficient if it assures us that an ALJ considered the important evidence and enables us to trace its reasoning," but that a "conclusory" analysis will not suffice).

**Conflicting Testimony**

Walunga argues that the ALJ erred when he failed to resolve conflicts between the testimony of VE and the Dictionary of Occupational Titles ("DOT"). She urges that when the VE testified that Walunga could perform the functions of a bench assembler, she incorrectly cited that job as DOT listing 017.684-010, which was actually the listing for a "taper, printed circuit layout" position. Plt. Br. [#12] at 12. She similarly argues that when the VE incorrectly cited DOT listing 739.687-182 as

that of inspector position, instead of as a "table worker," a conflict arose that the ALJ was obligated to resolve in his decision.  In response, the Commissioner argues that the VE's error was inconsequential because Walunga does not "contest that a hypothetical person" with her residual functional capacity could "perform the jobs identified by the VE." Def. Resp. Br. [#20] at 13.

In hearings before an ALJ, "[v]ocational experts often supplement the information provided by the DOT by providing an impartial assessment of the types of occupations in which claimants can work and the availability of positions in such occupations." *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  It is within the ALJ's discretion whether to employ a VE, "but once an ALJ decides to rely on a VE's testimony, he must make sure that the testimony comports with the rules set forth in the Commissioner's Social Security Rulings." *Id.*  Thus, where any conflict arises between a VE's testimony and the information in the DOT, an ALJ must resolve those discrepancies before relying on the conflicting testimony. *Id.*  The Seventh Circuit has said that "[a] conflict is apparent if it is 'so obvious that the ALJ should have picked up on [it] without any assistance.'" *Id.* at 570.  When an apparent conflict arises, an ALJ is "required to obtain reasonable explanations for the conflict." *Id.*

Before issuing his opinion on Walunga's claims, the ALJ determined that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." ALJ Dec. [#8-3] at 13. During the hearing, the ALJ did not identify any apparent conflict between her testimony and the information provided in the DOT. Because I do not believe that the VE's mis-citation of the listings was "so obvious" that the ALJ "should have picked up on it without any assistance," I do not find any error in his evaluation of her testimony.[1]

Moreover, Walunga's counsel did not identify this alleged conflict between the VE's testimony and the accurate listings in the DOT during the hearing.

> [T]he failure of [claimant's] counsel to identify the conflicts at the time of the hearing is not without consequence. [Claimant] now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT.

*Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). Walunga does not argue that the ALJ should have picked up on the discrepancy "without any assistance"; she argues simply that the discrepancy "indicates a clear conflict between the VE's testimony and the DOT," which is not sufficient to meet her burden.

---

[1]Counsel has not provided any legal support for the notion that an ALJ must commit DOT listings to memory, nor is this Court aware of any such legal support.

**Credibility Determinations**

Finally, Walunga argues that the ALJ's credibility finding was "patently wrong" when he concluded that she was "not credible." Plt. Br. [#12] at 13. Specifically, she argues that the ALJ's reliance on her "minimal lifetime earnings," "limited work history," and the fact that "she had never worked at the substantial gainful activity level" to find her not credible "fails to consider the fact that she has children and that her relatively poor work history could simply be the byproduct of her being a homemaker." *Id.* She also argues that he should have considered her fear of possible side effects of medication before drawing a negative conclusion from the fact that Walunga failed to take her blood pressure medication. Finally, she urges that the ALJ should have considered whether Walunga's condition deteriorated over time before discrediting her testimony based on discrepancies between her 2006 consultive exam and her statements in her August 2011 hearing.

"An ALJ's credibility determination is entitled to deference, and we will overturn a credibility finding only if it is 'patently wrong.'" *Bates*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Seventh Circuit has been clear that district courts "are not allowed to reweigh the facts or reconsider the evidence." *Id.* "[A]n ALJ's credibility assessment will stand as long as [there is] some support in the record." *Berger v. Astrue*, 516 F.3d 539,

546 (7th Cir. 2008) (internal citations). However, "when a credibility finding rests on 'objective factors or fundamental implausibilities,' rather than on a claimant's demeanor or other subjective factors, we have greater leeway to evaluate the ALJ's determination." *Id.* (citing *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013)). When making credibility determinations, an ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503,516 (7th Cir. 2009) ("[T]he ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations.") (internal citations omitted).

In this case, the ALJ based his decision on a variety of factors, including record evidence, such as Walunga's testimony, her medical records, and work history. In his assessment, the ALJ found that Walunga had engaged in some behavior that undermined her credibility, including her noncompliance with treatment. Specifically, he noted that in June 2006 when she sought medical attention for a racing heart, she reported that she had stopped taking her blood pressure medicine three years earlier. She also failed to show up for several doctor's appointments, and the ALJ noted that "[a]t one point, she was

told she had one more chance or she was going to be discharged
from the clinic." ALJ Dec. [#8-3] at 10. Walunga also failed to
report income from babysitting in 2003 and 2004, which undermines
her credibility.  Collectively, these facts suggest that it was
reasonable to regard Walunga's testimony with some skepticism.

As for his assessment of her work history, Walunga now
argues before this Court that her low lifetime earnings were due
to her decision to stay home and care for her children.  The ALJ,
however, reviewed Walunga's work history in relation to the onset
of her alleged impairments, and found that she has not worked
since 1989 "due to her impairments," even though her significant
health problems did not manifest until many years later.  The ALJ
never considered that Walunga chose not to work in order to care
for her children, because that was not the substance of her
testimony.  When asked why she has not worked since 1989,
Walunga's answer was "[b]ecause of my knees ... and my back."
Hearing Tr. [#8-3] at 7.  When the ALJ asked her to elaborate,
she described "arthritis in [her] knees and osteoarthritis in
[her] back." *Id.*  She did not claim that her failure to work had
anything to do with her decision to stay home and raise her
children.  Therefore, it was not improper to find that Walunga's
negligible earnings prior to the onset of her disability
diminished her credibility. 20 C.F.R. § 404.1529(c)(3) ("We will
consider all of the evidence presented, including information

about your prior work record."); *see also Simila v. Astrue*, 573
F.3d 503, 520 (7th Cir. 2009) (affirming ALJ's decision to
discredit claimant's testimony where his earnings declined prior
to the onset alleged impairment).

Walunga also argues that the ALJ erred when he failed to
consider that she discontinued her blood pressure medication
because of the side effects, namely, hand cramps. At the
hearing, the ALJ specifically asked Walunga whether she
experienced any side effects from her medications, and she
answered that "[t]hey're giving me hand cramps." Hrg. Tr. [#8-3]
at 49-50. In his decision, the ALJ explicitly considered her
testimony that "her hand cramps up three times per day, for 4
[to] 5 minutes at a time, during which she is unable to use them
at all." ALJ Dec. [#8-3] at 11; Hrg. Tr. 8-3 at 44. However, he
found that testimony was inconsistent with the medical record,
which indicated there were "virtually no problems with the use of
the hands." Therefore, the record evidence does not support
Walunga's contention that the ALJ failed to consider the side
effects of medication as a justification for taking her blood
pressure medicine. What the record shows is that he did consider
it, but found that it was not supported by the evidence, which
factored into his credibility assessment.

Finally, Walunga challenges the ALJ's reliance on the 2006
consultative examination to discredit her testimony. She argues

it was an error for the ALJ to rely on a five-year-old physical examination, while ignoring the "more recent evidence of impairment." Plt. Br. [#12] at 14. I cannot agree that the ALJ's reliance on the 2006 consultative examination was improper, and while his analysis may not have been flawless, it was not "patently wrong." *See Simila v. Astrue*, 573 F.3d 503 (7th Cir. 502) (upholding an ALJ decision that was "not flawless," but far from "patently wrong"). As an initial matter, it was relevant for the ALJ to consider the inconsistencies between Walunga's 2006 activity report and her statements in her consultative examination of the same year. For example, Walunga reported a standing limitation in her 2006 hearing, but not during her 2006 consultative examination, and such an inconsistency is relevant to her credibility. *Id.* Charged with the responsibility of reviewing the entire record, the ALJ was not "patently wrong" to highlight inconsistencies between the 2006 consultative exam and activity report.

As for the ALJ's comparison of Walunga's 2011 hearing testimony to her 2006 consultative examination as a route to discredit her, it was not "patently wrong" for him to consider the discrepancies between those two reports. He noted that at her 2011 hearing, Walunga testified "that she could only lift five pounds, stand about twenty minutes, sit for one hour, and had problems with her hands," yet she reported in her 2006

consultative examination that she "could lift three pounds, stand

for one hour, sit for 1.5 hours at a time, and cleaned her home

and shopped independently." ALJ Dec. [#8-3] at 11. Walunga argues

that comparing her 2011 testimony to a 2006 consultative

examination ignores the possibility that her ailments were

symptoms of a progressive illnesses that worsened over time.

Plt. Br. [#12] at 14.  However, it was not an error for the ALJ

to refer back to the 2006 consultative examination because he was

charged with reviewing the entire record. *Shideler v. Astrue*, 688

F.3d 306, (7th Cir. 2012) ("When evaluating credibility, the ALJ

must consider the entire case record and give specific reasons

for the weight given to the individual's statements." (internal

citations omitted)).  Moreover, the 2006 consultative examination

was the only one in the record; there was no more recent

consultative examination to which he could refer.  I cannot say

that the ALJ's credibility determination lacked reason or

support, even if he failed to articulate or account for the

possibility that Walunga's symptoms could have worsened over

time.

Accordingly, I conclude that the ALJ properly considered

both Walunga's subjective complaints and evidence undermining the

credibility of those complaints.  He based his decision on

multiple factors and the entire case record as the regulations

require.  The objective record evidence supports skepticism for

Walugna's testimony, and preclude a finding that the ALJ's determination was "patently wrong."

IV.

For the foregoing reasons, Walunga's motion for summary judgment is denied in part and granted to the extent that this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTER ORDER:**

**Dated**: June 23, 2014

_____

**Elaine E. Bucklo**
United States District Judge